**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JENNIFER FRAZIER,**

        **Plaintiff,**

    **v.**                          **Case No.: 2:14-cv-2735
JUDGE SMITH
Magistrate Judge Kemp**

**RICHLAND PUBLIC HEALTH DEPT.,** *et al.***,**

        **Defendants.**

## <u>OPINION AND ORDER</u>

This matter is before the Court upon the Motion for Summary Judgment (Doc. 25) of Richland Public Health ("RPH"). Plaintiff opposed RPH's Motion (Doc. 30) and RPH replied in support (Doc. 31). Additionally, RPH filed a Motion to Strike (Doc. 32). Again, Plaintiff opposed RPH's Motion (Doc. 33) and RPH relied in support (Doc. 34). These matters are now ripe for review. For the following reasons, the Court **GRANTS** RPH's Motion for Summary Judgment and **DENIES as moot** RPH's Motion to Strike.

## I.  BACKGROUND

This lawsuit arises out of the employment relationship between Plaintiff Jennifer Frazier ("Frazier" or "Plaintiff") and Defendant RPH. Frazier is a female Ohio resident who serves as a Sanitarian III for RPH. (*See* Doc. 1, Compl. at ¶ 4). RPH is a county health department in Mansfield, Ohio. (*Id.* at 2). Frazier began working for RPH on October 2, 2000, as a Sanitarian in Training and was promoted to Sanitarian I after passing an examination. (Doc. 18, Frazier Dep. 23, 24, 29–30). Defendant Stanley Saalman ("Saalman") was formerly the Health Commissioner at RPH until his retirement in September 2013. (Doc. 19, Saalman Dep. at 6–7).

As a Sanitarian I, Frazier performed numerous duties including mosquito spraying, food service inspections, campground inspections, and pool inspections. (Doc. 18, Frazier Dep. at 32). Frazier applied for a Sanitation III position while still a Sanitation I and received the job on January 30, 2006. (*Id.* at 42, 68–69). The Sanitation III job was a promotion, complete with a pay raise. (*Id.* at 44). As a Sanitarian III, Frazier focuses on lead testing, nuisance complaints, healthy housing tests, radon testing, and rat, bedbug, and roach control. (*Id.* at 32, 70). After two Sanitarian I's were laid off in 2014, Frazier had to pick up some food service inspections and her overall workload increased. (*Id.* at 71, 51).

Currently, there are six Sanitarians working at RPH. (*Id.* at 33). Frazier is one of two Sanitarian III's. (*Id.*). Frazier's current supervisor is Matthew Work, the Director of Environmental Health. (*Id.* at 34–36). Work supervises the Sanitarian III's and has supervised Frazier since 2008. (*Id.*). Frazier also works with Wes Engelbach, a sanitation supervisor who oversees the Sanitarian I's and the Sanitarian II's. (*Id.*).

Frazier served as the union president of American Federation of State, County, and Municipal Employees Local 3469 (the "Union" or "AFSCME") from 2010 to 2013 when she voluntarily stepped down. (*Id.* at 37, 41). The Union and RPH have a collective bargaining agreement ("CBA"). (*Id.* at 38). As president, Frazier was the lead negotiator of the latest CBA between the Union and RPH. (*Id.* at 39). Frazier stepped down in July, 2013 when she returned from FMLA leave. (*Id.*). Starting in 2012, a series of incidents began to wear down the relationship between Frazier and RPH.

In early 2013, Julie Ciesla, another RPH employee, filed an EEOC charge against Rick Grega, the Director of HR and IT, relating to an incident in the fall or summer of 2012. (Doc. 1, Compl. at ¶¶ 72–73). Ciesla charged that Grega used a hand massager on his neck and body

while making sexual sounds and overtones in front of her.  (*Id.*).  In December 2012, Frazier served as a witness for Ciesla in an internal investigation by R.L. Emmons, an independent investigator (the "Ciesla Investigation").  (Doc. 1, Compl. at ¶ 74; Doc. 18, Frazier Dep. at 270).  Although Frazier did not witness the incident, she provided information to Mr. Emmons regarding incidents other women at RPH had with Grega.  (Doc. 18, Frazier Dep. at 271–72).  After serving as Ciesla's witness, Frazier believes her work environment began to change.  (*Id.*).

A.    **Saalman Incidents**

Frazier's relationship with Saalman is the focal point of this lawsuit and two incidents are central to this case.  The first incident involved Saalman pushing Frazier into a dark women's bathroom and the second involves Saalman approaching Frazier in her office on the same day to talk about the earlier incident (collectively, the "Camera Incidents").  As Frazier's interactions with Saalman are central to her claims in this case, the Court will recount some incidents between Saalman and Frazier leading up to the Camera Incidents.

According to the record, the first hostile encounter between Saalman and Frazier stemmed from a November 2, 2011 altercation between Saalman and other RPH employees.  (Doc. 18, Frazier Dep. at 86).  Saalman went on a rant regarding mileage reimbursements in the department.  (*Id.*).  Saalman was arguing with Work and two nurses from the department, Marilyn McQuillen and Mary Derr.  (*Id.* at 86–87).  Saalman allegedly threw papers in McQuillen's face and yelled at her.  (*Id.* at 87–89).  McQuillen also told Frazier that Saalman had stated that Virginia Jeffries stole from the department.  (*Id.* at 90).  Jeffries did indeed steal close to $300,000.00 from the department.  (*Id.* at 91).  On November 4, 2011, Frazier filed a formal grievance on behalf of McQuillen regarding the incident.  (*Id.* at 78, 80).  Frazier sent the grievance to the health commissioners and the board but never spoke to Saalman about the

grievance.  (*Id.* at 81, 89).  The board issued a letter to Saalman regarding the incident which Frazier characterized as a customary and generic response.  (*Id.* at 89–90).

Frazier also had an incident with Saalman during a May 17, 2013 meeting attended by Saalman, Frazier, Grega, and an RPH employee named Eric Byrd.  (*Id.* at 76).  The meeting was held to discuss two employees who felt they should be receiving more pay because the employees were doing a supervisor's job.  (*Id.* at 76).  At some point in the conversation, Saalman got up, leaned across the table, got within seven to eight inches of Frazier's face, and screamed, "[y]ou tried to get me fired."[1]  (*Id.* at 77).  Grega pulled Saalman back down by his shirt, and Byrd told Saalman "that was enough."  (*Id.* at 77).  Frazier never filed a written complaint regarding this incident and never discussed the matter with Saalman.  (*Id.* at 83–84).  Frazier alleges Saalman was not upset about the meeting, but about the formal grievance Frazier filed for McQuillen.  (*Id.* at 78).

The aforementioned Camera Incidents occurred on July 11, 2013, and involved a surveillance camera set up at the RPH Lexington Avenue facility that was pointed in the direction of the women's restroom.  (*Id.* at 91).  Frazier was the Union president at the time.  (Doc. 1, Compl. at ¶ 8).  On June 19, 2013, Beth Conrad, Sue Osborn, and Andrea Barnes all individually approached Frazier about a camera that was set up in an office adjacent to the women's restroom.  (*Id.* at ¶ 7).  Frazier went to the women's restroom to verify that the camera was pointed at the bathroom.  (Doc. 18, Frazier Dep. at 92).  Frazier saw a camera in Phillip Nichols' office pointed toward the women's restroom.  (*Id.* at 93).  Nichols was the information technology manager at RPH and his office was six to seven feet away from the restroom.  (*Id.* at 93, 108).  The camera had a view of the door to the women's restroom but Frazier did not know

---

[1] This is understood to be a reference to Frazier filing the November 2011 grievance on behalf of McQuillen.

if the camera could see inside the restroom. (*Id.* at 94). Frazier reported the camera to Ciesla, who, in turn, reported the camera issue to Saalman. (*Id.* at 95–96).

On June 28, 2013, the Union's executive committee drafted a letter to the Personnel Committee of the Board of Health asking for information about the camera. (*Id.* at 102). The executive committee consisted of Osborn, Jill Burger, and Larry Scott, Ben Mutti, Nikki Franklin, Tina Nichols, and Frazier. (*Id.* at 97–98). Frazier and Mutti were the primary authors of the letter. (*Id.* at 98). The Executive Committee distributed a copy of the letter on July 8th to each of the individual members of the Personnel Committee of the Board of Health, and delivered copies to Saalman and to all bargaining unit employees. (*Id.* at 103–05).

On July 11, when Frazier arrived for work, Saalman asked her to talk to him and together, they walked toward the women's restroom. (*Id.* at 106–21). Once outside the door to the women's restroom, Saalman asked Frazier if she could see the camera in Nichols' office. (*Id.*). Frazier replied that she could see the camera. (*Id.*). Saalman then opened the door to the restroom and told Frazier to go inside the restroom to see if she could still see the camera. (*Id.*). Because the lights were off, Frazier made no move to enter the restroom. (*Id.*). Frazier was leaning on the door when Saalman again asked if she could see the camera. (*Id.*). Frazier indicated that she could not see the camera and noticed that Saalman was getting visibly upset (*Id.* at 108–09). Saalman was within a foot or two of Frazier and then put both hands on her shoulders and pushed her into the door and thereby, into the dark women's restroom. (*Id.*). After Frazier was in the restroom, Saalman got inches from her face and began screaming at her, repeatedly asking if she could see the camera. (*Id.*). At this time, Frazier was up against the sink unable to retreat further. (*Id.*). Frazier tried to exit the bathroom by going around Saalman but he pushed her back against the sink and asked her if she could see the camera again. (*Id.*).

Saalman was keeping the door open with his body, but was blocking Frazier from leaving. (*Id.*). Frazier told Saalman she did not know what was on the camera and that she didn't write the letter from the executive board and they started to move out of the bathroom. (*Id.*).

On the walk back to her office, Frazier saw Osborn and began crying when Osborn asked if Frazier was okay. (*Id.* at 127–130). Once in Frazier's office, Osborn told Frazier that she had heard Saalman yelling and screaming. (*Id.*). Frazier then called the AFSCME staff representative, Eric Boyd, and left a message about what happened. (*Id.*). Osborn called Boyd's supervisor, Roberta Skok, and passed the phone off to Frazier. (*Id.*). Skok told Frazier to file charges with the Sheriff. (*Id.*). Around 30 minutes later, Saalman came to Frazier's office to talk to Frazier. (*Id.*). Frazier cracked the door and told him she did not want to talk but Saalman forced the door open, hitting Osborn who was behind the door. (*Id.* at 132–34). Osborn left at Saalman's request and Saalman attempted to apologize. (*Id.*). Frazier would not accept his apology and Saalman again put his hand on Frazier, moving her slightly backwards and told her that he was trying to apologize. (*Id.*). Frazier still refused his apology and Saalman stormed out of her office. (*Id.*).

Work's office is across from Frazier's office and he asked what was going on after Saalman left Frazier's office. (*Id.* at 137). After hearing Frazier's description of the events in the bathroom, he told her to fill out an incident report and call the Sheriff. (*Id.*). Frazier filled out an incident report and gave it to Work and Grega. (*Id.* at 139). Frazier went into Grega's office with Grega, Osborn, and Selby Dorgan, the Director of Health Promotion and Education, to talk about the incident while each took notes. (*Id.* at 141). After the meeting, Grega told Frazier to stay in her area of the building and that Saalman would stay in his area. (*Id.* at 144). Frazier thought this was an inadequate response to the incident because she feared Saalman and

felt that it was likely she would run into him again.  (*Id.* at 145).  Frazier never saw Saalman again at work and that was his last day at work at RPH.  (*Id.* at 50, 145).

Frazier had two investigations related to her interactions with Saalman.  The first was with the Sheriff's office who ultimately informed Frazier that the city attorney did not wish to pursue charges against Saalman.  (*Id.* at 168; Doc. 18-1, Frazier Dep. Exs. at X).  Frazier also sat for an interview with Doug Duckett, an attorney working for RPH Human Resources.  (Doc. 18, Frazier Dep. at 192–193).  The local newspaper, the Mansfield News Journal, became aware of the Camera Incidents and began publishing stories regarding the encounters.  (*Id.* at 155, 180–81).  On July 18, 2013, RPH held an Environmental Health staff meeting in which Work spoke about an upcoming levy that concerned RPH's budget.  (*Id.* at 179–80).  Work said that "all the negative publicity from the [Mansfield] News Journal" may have an impact on the upcoming levy.  (*Id.* at 180).  He also stated that people could be laid off if the levy did not pass.  (*Id.* at 181).  Frazier believed these comments were directed at her because Work looked at her during his speech and she left the meeting crying.  (*Id.* at 182).  Frazier remained at work the rest of the day and spoke to Osborn who told Frazier that it was not her fault and that things would get better (*Id.* at 183–84).  Helen Mitchell, an RPH secretary, also told Frazier she did the right thing by reporting the Camera Incidents.  (*Id.*).  Following the meeting, Frazier went to see her primary care physician and nurse practitioner who diagnosed her with depression, anxiety, and high stress.  (*Id.* at 185–86).  Frazier began taking medication for her conditions and took leave from RPH under the Family Medical Leave Act ("FMLA") from July 19, 2013 to September 5, 2013.  (*Id.* at 209–11).

## B.    Retaliatory Actions

As soon as she returned from FMLA leave, Frazier alleges RPH employees began retaliating against her.  In fact, the day she returned to work, Work came into Frazier's office and

shut the door to update her after her absence.[2]  (Doc. 30-3, Frazier Decl. at ¶¶ 63–65).  Frazier, feeling uncomfortable being in her office with the door closed, left to get a union representative. (*Id.*).  When Frazier arrived back with Larry Scott, Work said "I should write you both up for having a union meeting on work time."  (*Id.*).  He never followed through on the threat.  (*Id.*).

Shortly after returning to work following her FMLA leave, Osborn told Frazier that Work, Engelbach, Osborn, and a member of the clerical staff had a meeting regarding Mosquito control duties.  (Doc. 18, Frazier Dep. at 212–13).  Osborn informed Frazier that Engelbach was taking over Frazier's supervisory duties permanently.  (*Id.*).  Prior to her FMLA leave, Frazier, Osborn, and Deb Britton had performed mosquito spraying duties, but Engelbach replaced Frazier for the 2013 season.  (*Id.*).  Frazier's duties as a Sanitarian included the annual mosquito spraying program performed by RPH.  As a Sanitarian I, Frazier's role in the mosquito program was limited to riding with the summer intern who did the spraying and recording the amount of time the mosquito repellant sprayer was turned on.  (*Id.* at 36).  Frazier's role in mosquito spraying increased when she became a Sanitarian III and included supervision of two other RPH employees during spraying.  (*Id.* at 37, 47).

Frazier met with Work and asked him about her supervisory duties after her conversation with Osborn.  (*Id.* at 213).  Work told her that Engelbach was taking over her duties permanently.  (*Id.*).  In her declaration regarding this incident, Frazier provided a more detailed description of the events, "I asked Mr. Work 'did you remove my duties from the mosquito control program and give them to Wes in my absence or permanently?' He replied, 'giving your mosquito duties to Wes makes sense and this will be a discussion that we have at a later time.'" (Doc. 30-3, Frazier Decl. at ¶ 69).  Frazier sent an email to Work regarding her duties because

---

[2] Although given repeated chances to describe other incidents related to her claims during her deposition, Frazier never mentioned this incident.  (Doc. 18, Frazier Dep. at 204, 234, 260–61, 264–65).

she was confused after the earlier meeting.  (Doc. 18, Frazier Dep. at 220; Doc. 18-1, Frazier Dep. Exs. at CC).  Work did not respond.  (Doc. 18-1, Frazier Dep. Exs. at DD).

In March, 2014, Work sent Frazier and email asking her to review some documents related to the mosquito program.  (Doc. 18, Frazier Dep. at 222; Doc. 18-1, Frazier Dep. Exs. at DD).  Frazier was still unclear about her mosquito control duties and asked for further clarification.  (Doc. 18, Frazier Dep. at 224).  Frazier stated, "I only have one question and it is the same question that I have been asking repeatedly since early September 2013 . . . and that is whether or not you took the mosquito program out from under my duties and responsibilities and gave the program to Wes while I was out on FMLA?"  (Doc. 18-1, Frazier Dep. Exs. at FF).  Work responded to Frazier with two specific tasks relating to the Mosquito program that he wanted her to perform.  (Doc. 18-1, Frazier Dep. Exs. at GG).  Frazier asked Work whether or not she was part of the Mosquito program and Work responded "You will be part of the 2014 Mosquito program."  (*Id.* at GG, HH).  During a meeting prior to the beginning of mosquito season, Frazier met with Work, Osborn, Engelbach, and Britton where Work specifically identified Engelbach as the supervisor of the program.  (Doc. 18, Frazier Dep. at 233–34).  Frazier performed the scheduling in 2014 but had less involvement than she did prior to her FMLA leave.  (*Id.* at 214–15).  She had no involvement in the mosquito program in 2015.  (*Id.*).

On November 12, 2013, Frazier was speaking to Work regarding time and mileage for RPH employees.  (*Id.* at 196–97).  Work told Frazier that he noticed that she did not go home after work because the mileage she submitted did not match the mileage from RPH to her house.  (*Id.*).  Frazier found the comment creepy and felt Work was trying to intimidate her.  (*Id.*).  She did not file a formal complaint or grievance but told Tremmel of the incident.  (*Id.*).  Tremmel told her that it was just "Matt being Matt."  (*Id.* at 198).

On February 27, 2014, Frazier was again bothered by Work when a payroll sheet went missing from her desk.  (*Id.* at 199–201).  Ciesla found Frazier's payroll sheet on Work's desk under a stack of other papers.  (*Id.*).  Frazier did not make an oral or written complaint about this incident.  (*Id.*).

On March 26, 2014, RPH had an all-staff meeting regarding sexual harassment where Jonathan Downes, an RPH employee, stated that "'some people' are 'too sensitive about boorish behavior.'"  (*Id.* at 235).  Frazier felt that Downes was directing his comments at her and she felt intimidated by his actions.  (*Id.*).

Frazier's next incident with Work occurred in July 2014 and concerned a letter RPH received from the Ohio Department of Health ("ODH Letter").  (*Id.* at 201–02).  The ODH Letter was about the lead program—which Frazier was a part of—and required a timely response.  (*Id.*).  Frazier responded to the ODH Letter either right before it was due or just after the due date.  (*Id.*).  Frazier felt she was being sabotaged by Work and informed Tremmel of her concerns.  (*Id.* at 203–04).  Tremmel reviewed her response to the letter and asked her to make some changes but did not respond to her concerns about being sabotaged.  (*Id.*).

In the fall or winter of 2014, Frazier was making toast in the break room when Tremmel approached Frazier from behind and put his hand on her lower back and begin talking about the weather.  (*Id.* at 267).  Frazier immediately turned around and the left the room but did not file a formal report regarding the incident.  (*Id.*).

In February 2015, Frazier had a conversation with Rebecca Wallace, an RPH employee, where they discussed sending food service reports to the Mansfield News Journal.  (*Id.* at 259, 264).  Grega heard this conversation and called Frazier into his office and told her that he was going to begin disciplinary proceedings against her and that he was investigating her mention of

10

the News Journal.  (*Id.* at 260).  Frazier believes Grega thought she was going to talk to the News Journal regarding the incident with Saalman.  (*Id.* at 264).  In August 2015, Engelbach scheduled Frazier to do all of the food service inspections at the County Fair despite her request for time off to sit for her deposition in this case.  (*Id.* at 261–62).  Last, Frazier believes that Work retaliated against her by requiring her to input all of her daily activities and time.  (*Id.* at 273).  Although every other Sanitarian is now required to do so, for a period of one or two weeks, only Frazier was required to input her own time.  (*Id.*).  Ultimately, Frazier has never been demoted, has never had a decrease in pay, and has never received a negative performance evaluation.  (*Id.* at 34–35).  Frazier has performed her job consistently since these described incidents and she does not believe it has affected her work performance.

Frazier initiated this case on December 26, 2014.  Frazier brings two claims against RPH: (1) hostile work environment under 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02(A); and (2) retaliation under 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02(I).  Additionally, Frazier brings four state law claims against Saalman: (1) civil assault; (2) civil battery; (3) false imprisonment; and (4) intentional infliction of emotional distress.

## II.    STANDARD OF REVIEW

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient

11

evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e);  *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").  In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party."  *Id*.

### III.    DISCUSSION

RPH moved for summary judgment on Frazier's hostile work environment claims under 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02(A); and her retaliation claims under 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02(I).  RPH alleges that Frazier cannot make out a prima facie case for a hostile work environment claim because the alleged harassment was not sufficiently severe or persuasive.  Additionally, RPH alleges that it has an affirmative defense to a hostile work environment claim.  RPH also argues that Frazier cannot make out a prima facie case of retaliation or overcome the legitimate reasons for the claimed adverse employment

action.  Frazier factually and legally rebuts RPH's claims.  The Court will address each of RPH's arguments in turn.

**A.      Hostile Work Environment**

As an initial matter, the Court notes that in Ohio, the elements and legal standards for evaluating sexual harassment/hostile work environment claims are the same under both federal and state law.  *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).  Therefore, the Court will consider Frazier's Title VII and Ohio Civil Rights Act sexual harassment/hostile work environment claims together.

"A violation of Title VII is established if discrimination based on sex has created a hostile or abusive work environment."  *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (internal quotation marks omitted).  For Frazier to establish a prima facie Title VII claim of hostile environment sexual harassment, she must demonstrate: "'(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment,' and (5) the employer is liable for the harassment."  *Blackmon v. Eaton Corp.*, 587 F. App'x 925, 930 (6th Cir. 2014) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).  Additionally, the Supreme Court has held that there is a vital difference if the alleged harassment was from a supervisor or a co-worker.  "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  If the harasser is a supervisor and the harassment "culminates in a tangible employment action, the employer is strictly liable."  *Id.*  However, there are two affirmative defenses if no tangible employment action is taken: "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to

take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

RPH does not dispute that Frazier is a member of a protected class or that the alleged harassment was unwelcome, but challenges each of the remaining elements of Frazier's hostile work environment claim and alleges that RPH has an affirmative defense to the claimed supervisor harassment.  Frazier makes no argument regarding co-worker harassment but asserts that the incident with Saalman alone is sufficient to show a hostile work environment based on sex in this case.

First, RPH alleges that Frazier has presented no facts that any of the alleged harassment was based on her sex.  Frazier claims that this element is evidenced "by the fact that as hot-tempered as Saalman was, he never physically invaded any male's space, including Dean Wells just moments before his assault on Frazier."  (Doc. 30, Mem. Opp. at 16).

When alleging harassment based on a protected class, "[i]t is axiomatic that [a plaintiff] must provide a causal nexus between [the protected class] and the complained-of conduct." *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006).  Similar to Title VII, "[Ohio Revised Code §] 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under [Ohio Revised Code §] 4112.02(A) unless based on a prohibited classification." *Fernandez v. City of Pataskala, Ohio*, No. 2:05-CV-75, 2006 WL 3257389, at *17 (S.D. Ohio Nov. 9, 2006) (quoting *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 176–77, 729 N.E. 2d 726 (2000)) (Graham, J.).  "To establish this element, Frazier "'must show that but for the fact of her sex, she would not have been the object of harassment.'"

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).  As in this case, direct evidence of discriminatory animus can be elusive and thus, Frazier is entitled to use inferences and circumstantial evidence to show the nexus between the complained-of conduct and her sex.  *Id.* (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004)).  The use of indirect evidence requires more than "conclusory allegations and unsupported speculations [of] hostility toward females." *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) (finding no nexus where supervisor openly discussed sexual positions, genitalia, and other sexual innuendo but did not direct those comments at the plaintiffs); *see also Williams*, 187 F.3d at 565–66 (finding nexus where plaintiff was repeatedly ostracized and "gender-specific epithets" were used, such as "slut" and "fucking women"); *Jones v. Donahoe*, No. 3:10-CV-522, 2013 WL 4042039, at *6 (W.D. Ky. Aug. 8, 2013) (finding no nexus where the allegations of abusive conduct were facially neutral); *Thomas v. Ametech*, 464 F. Supp. 2d 688, 698 (N.D. Ohio 2006) (finding racial animus present due to presence of a noose near the plaintiff's workstation, a drawing of monkeys near his locker, and the use of the word "nigger").

In this case, Frazier has presented no direct evidence that the alleged harassment was due to her sex.  Further, her own declaration makes clear that she believed the animus behind the Camera Incidents was something other than her sex, "[o]n this occasion, similar to the July 11 attack, Saalman was apparently infuriated with Frazier **over actions she took in her capacity as president of the union** when she filed the formal grievance regarding the McQuillen incident." (Doc. 30, Mem. Opp. at 5 (emphasis added)).

Accordingly, Frazier relies on indirect evidence, arguing that Saalman never physically invaded a male's space.  Although Frazier declared that she witnessed Saalman's explosive

temper numerous times, "especially toward other female employees," the record before this Court is devoid of any evidence of incidents witnessed by Frazier. (Doc. 30-3, Frazier Decl. at ¶ 14). The first incident Frazier alludes to concerns a complaint filed by McQuillen in which she was offended by Saalman's discussion with or near Mary Derr regarding mileage reimbursements.[3] (Doc. 19-1, Saalman Dep. at Ex. 5–6). Frazier does not claim to have actually witnessed this event. There is no evidence from Saalman's deposition, the harassment complaint, or the board's letter to Saalman tending to show that the discussion with Mary Derr was based on sex other than the fact that Saalman was speaking to a female coworker. (*Id.*). Importantly, Frazier's contemporaneous account of this incident does not include any hint of sex-based animus, "[Saalman] has verbally and morally battered and tarnished the working morale of employees, as well as the reputation of **the entire Health Department** by insinuating that **all Health Department Employees** are intentionally deceitful in our actions, untrustworthy, swindlers, liars, and cheaters. This particular outburst is not the first, but it is however the most intense and far reaching." (Doc. 18-1, Frazier Dep. at Ex. K (emphasis added)).

The second incident Frazier provides involves Saalman yelling at a female employee named Amy Schmitt. (Doc. 30-5, Randall Decl. at ¶ 7). Again, although this confrontation involved Saalman yelling and putting his hands on a female coworker, other than the coworker's gender, there is no evidence that this incident occurred because of Ms. Schmitt's sex. (*Id.* at ¶¶ 8–15). Although the Court weighs disputed facts in favor of Frazier, the Court notes that Schmidt denies that Saalman touched her inappropriately or physically attacked her. (Doc. 31-1, Schmidt Decl. at ¶ 5). She denies being scared of losing her job, being scared of Saalman, or being threatened by his behavior. (*Id.*, at ¶¶ 8–9).

---

[3] The grievance filed by McQuillen states Saalman was speaking to Mary Derr but the grievance filed by Frazier states that Saalman was yelling at Work. (Doc. 18-1, Frazier Dep. at Ex. K).

However, Saalman's alleged attacks were not limited to female coworkers.  Randall stated that Saalman "has a well established record of anger issues and an explosive temper." (Doc. 30-5, Randall Decl. at ¶ 16).  Conrad, Frazier, and Osborn noted the same.  (Doc. 30-2, Conrad Decl. at ¶ 6 ("I had heard [Saalman] screaming and yelling like this many times before"); Doc. 30-3, Frazier Decl. at ¶ 14 ("I had on numerous occasions before witnessed Saalman's explosive temper . . . ."; Doc. 30-4, Osborn Decl. at ¶ 5 ("I had heard [Saalman] yell like that many times before")).  Although Frazier may have noticed Saalman's temper "especially" when directed at other females, she does not claim that his temper was limited to female employees. (Doc. 30-3, Frazier Decl. at 14).  In fact, Frazier asserts Saalman yelled and screamed at Dean Wells, a male employee, on the same morning of the Camera Incidents.  (Doc. 30-1, Brykalski Decl. at ¶ 4).  The remainder of Frazier's supporting allegations are conclusory in nature and do not actually provide any evidence of a nexus between Frazier's sex and the alleged harassment. (*See e.g.*, Doc. 30-5, Randall Decl. at ¶ 17 ("Mr. Saalman gave other male managers, like Matt Work, the green light to react to female employees in a similar fashion, and refused to discipline them when he received a complaint about this type of behavior.")).

The only sex-based incident to which Frazier alludes did not involve Frazier as either a participant or a witness, but involved Grega and Ciesla.  Ciesla made an allegation of sexual harassment against Grega regarding his use of massager in Ciesla's presence.[4]  (Doc. 23, Grega Dep. at 10–11).  This isolated allegedly sexually-motivated incident—which occurred in 2012 and was not directed at Frazier—is not so significant as to cast a sexually discriminatory net on

---

[4] The investigative report of this incident tells that Ms. Ciesla believed Grega used the massager "because [Grega] was upset that [Ciesla] did not receive formal discipline" when it was discovered she sent inappropriate personal emails.  (Doc. 18-2, Frazier, Dep. at Ex. UU, Emmons Investigation).  Additionally Ciesla reported to Emmons that Grega did not use the massager on his erogenous zones and did not make any sexual references other than saying how good the massager felt.  (*Id.*).  Ciesla's EEOC charge states that she complained of sexual harassment but her charge was filed specifically for retaliation.  (Doc. 18-1, Frazier Dep. at Ex. T, Ciesla Charge).

all of the other facially neutral actions of RPH employees. *Baugham*, 211 F. App'x at 439. Frazier's other evidence regarding harassment by Work, Grega, Tremmel, and Engelbach is also completely devoid of any evidence of sex-based animus. Randall's declaration is replete with allegations that the animus directed at Frazier was based on reporting the incident with Stan, not based upon her sex. (Doc. 30-5, Randall Decl. at ¶¶ 24–25, 28). Accordingly, Frazier has failed to set forth an essential element of her hostile work environment claim—that a nexus exists between the complained-of conduct and Frazier's sex. Summary judgment as to Frazier's hostile work environment claims under Title VII and Ohio law is **GRANTED**.

## B.    Retaliation

Title VII of the Civil Rights Act provides that an employer may not discriminate against an employee because that employee "'made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)). As with Frazier's hostile work environment claim, Frazier's retaliation claims under both Ohio and federal law may be analyzed together. *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 817 (S.D. Ohio 2005) (Watson, J.), (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (Ohio 1981)) aff'd, 211 F. App'x 382 (6th Cir. 2006). Frazier must establish that: (1) she engaged in activity protected by Title VII; (2) the activity was known to RPH; (3) RPH thereafter took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552–53 (6th Cir. 2002)). Frazier alleges that she engaged in protected activity by participating in the Ciesla Investigation, by reporting Saalman for the Camera Incidents, and by filing an EEOC charge. She alleges that RPH knew of each of these activities and, in retaliation,

took an adverse employment action against her when RPH removed her mosquito duties.  RPH challenges each of the four elements of Frazier's retaliation claim.

### 1. Protected Activity

RPH argues that Frazier did not engage in protected activity and thus, that she has no claim for retaliation under Title VII.  The Complaint notes that the bathroom incident occurred "because Plaintiff investigated and reported the existence of a video recording device that was trained on a workplace women's restroom and placed in its location by a male employee."  (Doc. 1, Compl. at ¶ 1).   Additionally, Frazier asserts that RPH retaliated "because she filed a grievance against Defendant Saalman for the assaults and batteries she suffered at his hands and also because of Frazier's agreement to appear as a witness on behalf of a fellow female coworker who filed a sexual a harassment claim against one of these mid-level managers."  (*Id.*).

In order for discriminatory retaliation to have taken place, a plaintiff must show that she engaged in protected activity involving allegations of discriminatory employment practices. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("we hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."); s*ee also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (finding no protected activity under the ADEA when plaintiff expressed intent to sue company and coworkers but did not mention discrimination).  Title VII protects a plaintiff from retaliation in two ways: (1) under the "Participation Clause" which protects against retaliation arising out of a plaintiff's participation in a Title VII investigation; and (2) under the "Opposition Clause" which protects against retaliation arising out of a plaintiff's opposition of an employment practice which is unlawful under Title VII.  *Warren v. Ohio Dep't of Pub. Safety*, 24 F. App'x 259, 264 (6th Cir. 2001).  "The 'exceptionally broad protection' of the participation

clause extends to persons who have 'participated in any manner' in Title VII proceedings." *Booker*, 879 F.2d at 1312 (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1006 (5th Cir. 1969)).  The Participation Clause extends to internal investigations of unlawful discrimination pursuant to an EEOC charge.  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003).  Opposition conduct can consist of complaints to management, unions, other employees, or the public.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)).  However, the complaints still must concern employment practices which are unlawful under Title VII.  *Id.*

RPH argues that Frazier's participation in the Ciesla Investigation is not protected activity because Frazier did not use the words "harassment" or "discrimination" and because Frazier's involvement "did not relate to Ciesla's allegations."  (Doc. 25, Mot. at 32).  Although Frazier did not complain of any discrimination or harassment in the Ciesla Investigation, RPH's construction of the Participation Clause is far too narrow as the Participation Clause protects persons who participated "in any manner."  *Booker*, 879 F.2d at 1312 (internal quotations omitted).  There is no dispute that Ciesla filed allegations of sexual harassment against Grega and that Frazier provided testimony in the internal investigation regarding Grega's incidents with other female RPH employees.  (Doc. 18, Frazier Dep. at 272).  Frazier need not use the magic words "discrimination" or "harassment" to participate in an investigation of activity prohibited by Title VII.  *Booker*, 879 F.2d at 1312.

However, Title VII does not protect Frazier's pre-EEOC charge reports regarding against the Camera Incidents.  Although Frazier alleges in the Complaint that she filed a "formal written harassment charge against Defendant Saalman," that allegation is unsubstantiated by Frazier's deposition testimony and the incident report she filed.  (Doc. 1, Compl. at 43; Docs. 18, Frazier

Dep. at 271, Doc. 18-1, Frazier Dep. Exs. At Ex. M, Incident Report).  Simply, there is nothing in the incident report or Frazier's deposition testimony which shows that her incident report was opposing a work practice prohibited by Title VII.  The incident report does not even rise to the level of a "vague charge of discrimination" that the Sixth Circuit found inadequate in *Booker*. *Booker*, 879 F.2d at 1313.  Rather, Frazier's complaint against Saalman addresses a possibly illegal assault or a case of breaking a general code of civility which Title VII is not designed to protect.  Although Frazier eventually filed an EEOC charge regarding the Camera Incidents, her initial complaints to both the police and RPH do not allege or hint at any form of discrimination prohibited by Title VII.  Accordingly, Frazier's first protected activity with respect to the Camera Incidents occurred when she filed the EEOC charge in February, 2014.

### 2.      Activity Known to Defendant

RPH next alleges that Work and Engelbach, the two employees who changed Frazier's mosquito duties were not aware of Frazier's participation in the Ciesla Investigation.  Frazier does not directly respond to RPH's argument but generally argues that all of the prima facie elements of a retaliation claim are met.  RPH provided affidavits from both Work and Engelbach stating that neither was aware of Frazier's participation in the Ciesla Investigation until July, 2015—well after the decision was made to remove Frazier's mosquito duties.  (*See* Doc. 25-1, Engelbach Decl. at ¶¶ 4–5; Doc. 25-2, Work Decl. at ¶¶ 4–5).

In order to satisfy the knowledge element, a plaintiff may take two separate routes: (1) provide direct or circumstantial evidence that the relevant management decision-makers knew of the protected activity; or (2) provide evidence that the decision-maker acted in accordance with a retaliator's bias without individually evaluating the employee's situation or performance.  *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1069 (6th Cir. 2015); *Mulhall v.*

*Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).

Here, Frazier has provided no evidence that either Work or Engelbach were aware of her protected activity when they decided that Engelbach would take over Frazier's mosquito duties. Although both Work and Engelbach were likely aware of this lawsuit and the EEOC charge filed by Frazier in 2014, both have declared that they were unaware of Frazier's participation in the Ciesla Investigation. However, even if Work and Engelbach were aware of Frazier's protected activity and assuming the removal of the mosquito duties is an adverse employment action, there is no evidence showing a causal connection between Frazier's participation in the Ciesla Investigation and the removal of Frazier's mosquito duties.

### 3.      Causal Connection

"Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014), (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S.Ct. 2517, 2533 (2013)) *reh'g denied* (Apr. 2, 2014). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999).

In this case, nearly two years passed between Frazier's involvement in the Ciesla Investigation and the removal of her mosquito duties so the temporal factor weighs against a finding of causation. Additionally, Frazier's own witness declared that the reasoning behind any

alleged retaliatory action was Frazier's complaint to the Sheriff, not her involvement in the Ciesla Investigation.  (Doc. 30-5, Randall Decl. at ¶¶ 19, 24 ("Mr. Grega was deliberately retaliating against and treating Mrs. Frazier differently for filing a complaint about the Stan incident with the sheriff.")).  While there is no doubt that management retaliation against Frazier for her report against Saalman was likely unjustified and a breach of workplace decorum, it does not rise to retaliation because Frazier's complaint to the Sheriff did not contain allegations of discrimination made illegal under Title VII.  There is no evidence—direct or circumstantial—that any RPH employee retaliated against Frazier for her participation in the Ciesla Investigation.  Outside of Frazier's loss of mosquito duties, she has not alleged any other activity that would qualify as an adverse employment action in the Complaint or in her deposition testimony.

### B.    State Law Claims

Frazier also asserts state law claims of civil assault, civil battery, false imprisonment, and intentional infliction of emotional distress against Saalman.  Frazier only asserts federal subject matter jurisdiction in this case based on the alleged violations of Title VII.  Having granted summary judgment to RPH on Frazier's claims under Title VII and Ohio Revised Code § 4112, the Court declines to exercise supplemental jurisdiction over Frazier's remaining state law claims against Saalman.  It is well-settled that a District Court may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it possessed original jurisdiction.  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997).  Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed.  *Id.*; *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992).  Therefore, pursuant to 28 U.S.C. §1367(c)(3) and (d), the Court will dismiss Frazier's state law claims against Saalman without prejudice.

**C.     Motion to Strike**

Last, RPH moved to strike portions of the declarations filed by Frazier in opposing the Motion for Summary Judgment. RPH alleged that certain portions of the declarations contradicted deposition testimony and others contained conclusory lay opinion testimony. The Court notes that Rule 56, as amended in 2010, disfavors separate motions to strike in response to exhibits provided in summary judgment briefing:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. **There is no need to make a separate motion to strike**.

Fed. R. Civ. P. 56, 2010 Comm. Notes (emphasis added). However, regardless of the necessity of the Motion to Strike or the validity of the arguments therein, the matter is moot as the Court has granted RPH's Motion for Summary Judgment. Accordingly, the Court **DENIES as moot** RPH's Motion to Strike.

## IV.     CONCLUSION

Based on the foregoing, RPH's Motion for Summary Judgment is **GRANTED**. RPH's Motion to Strike is **DENIED as moot**. The Clerk shall **REMOVE** Documents 25 and 32 from the Court's pending motions list. Additionally, the Court **DECLINES** to exercise supplemental jurisdiction over the claims against Saalman. Accordingly, The Clerk shall **ENTER** final judgment in favor of RPH, **DISMISS** all claims against Saalman without prejudice, and **REMOVE** this case from the Court's pending cases list.

        **IT IS SO ORDERED.**

                          _/s/ George C. Smith_____
                          **GEORGE C. SMITH, JUDGE**
                          **UNITED STATES DISTRICT COURT**